## JERUSHA S. TRACY v. SALLY HUTCHINS.

### [IN CHANCERY.]

*Contract. Deed. Lease. Grantor and Grantee.*

T. and C. entered into a contract in which T. agreed to deed to C. one undivided half of his farm, and C. agreed to give back to T. a life lease of the same, and " to take the farm to the halves or otherwise to provide a decent and comfortable living for T. and his wife during their natural lives," and T. agreed to let C. have said farm so long as he fulfilled the above agreement. In pursuance of this agreement T. gave the deed and took a life lease. *Held,* that the contract determined what were the rights and liabilities of the parties under the deed and lease.

*Held* further, that C's title under the deed was conditional upon his fulfilling the stipulations of the contract on his part to .carry on the whole farm, and furnish the support therein named ; and that upon his neglect or refusal to fulfill said stipulations, T. had the right to re-enter upon the whole farm, and hold the same free and acquit of any right of C. thereto.

*Held,* also, that a grantee of C's undivided half of the farm, chargeable with a knowledge of the real character, true intent and meaning of the arrangement between T. and C. in pursuance of, and to effectuate which the deed and lease were executed, would succeed to all C's rights and obligations in the premises, no more, no less, notwithstanding the record showed a title in C. subject only to the lease of the same back to T.

APPEAL FROM CHANCERY. The oratrix, Jerusha Tracy, alleged in substance, that she was the daughter of Elijah Tracy, who, when old and infirm, being desirous of providing support and a home for himself and wife and daughter, and also of being relieved from the labor and trouble of carrying on his farm, entered into an agreement with one Ebenezer Colburn, by the terms of which he was to convey to Colburn one-half of his farm, and permit him to carry on the other half, and in consideration thereof, Colburn was to maintain and support him and his wife during their natural lives ; and on the 6th of May, 1819, by deed duly executed and acknowledged, he conveyed one-half of his farm to Colburn, and in order to secure the performance of the agreement on the part of Colburn, Mr. Tracy took a life lease of the same from Colburn ; that on the 16th of July, 1820, the parties having become dissatisfied with their agreement, mutually agreed to give up and cancel their contract, and from that time the same was abandoned and so treated by both parties ; that Tracy then entered into an agreement with one Hezekiah Colby of Tunbridge, on the same 16th of July, as follows :

"TUNBRIDGE, July 16th, 1820.

" An agreement between Elijah Tracy and Hezekiah Colby :— Said Tracy agrees to give to said Colby a deed of one-half of his real property, according to quantity and quality, on demand, and the said Colby agrees to give said Tracy at the same time a life lease of the same property, and further, the said Colby agrees to take the farm to the halves, or otherwise to provide a decent

and comfortable living for said Tracy and his wife during their natural lives, and for their daughter Jerusha till she has a home of her own, and said Tracy agrees to let said Colby have the farm so long as he fulfills the above agreement,—and the said Tracy agrees to put on a yoke of oxen, &c. And if said Colby shall make any betterments on said farm, either by clearing or building, or any other way that he has not got his pay for in the use of the betterments so made, at the expiration, of the above agreements, it shall be left to indifferent men to judge between him and said Tracy's heirs according to justice and equity. And said Colby further agrees to return the above mentioned stock and farming tools to said Tracy's heirs, at the expiration of the above agreement.

Signed by the parties."

That on the 17th of July, 1820, in further execution of this agreement at the request of Tracy, Colburn conveyed by deed to Colby, the undivided half of this farm, which had been conveyed to him, Colburn, by Tracy on the 6th of May, 1819, and on the same day, Tracy discharged Colburn from all liability on the life lease which he, Colburn, had given to Tracy on the same 6th of May—by giving to Colburn a quit-claim deed of a certain piece of land, " in Tunbridge aforesaid described as follows, viz : By virtue of a lease made and executed by the said Colburn to me on the 6th day of May, A. D. 1819, this deed being given for the express purpose of discharging said Colburn from any liability on the account of said lease" ; that under the agreement between Tracy and Colby, Colby took possession of the whole of Tracy's farm, and on the 11th of March, 1825, executed to Tracy a life lease of that portion of the farm which was deeded to him by Colburn ; that in this lease was the following admission, " And for the rent of said land, said Colby acknowledges the receipt of a deed of the same land as full payment for the rent during the above term" ; that the only consideration for the conveyance of the undivided half of the Tracy farm to Colby, was the agreement above set forth; by which Tracy hoped to be supported according to the terms thereof; that the life lease

was executed to secure the performance of the agreement on the part of Colby, but it was not properly drawn so as to be adapted to that end; that for a long time prior to January, 1830, Colby failed to perform his agreement, neglected to carry on the farm in a proper manner, and neglected to furnish the support provided in the agreement of July 16th, 1820; that on the 21st of January, 1830, Tracy sued Colby as bailiff and receiver of the profits of his farm since July 16th, 1820, and of the personal property thereon, and recovered judgment againt him for the same; that on the 12th of November, 1831, Tracy sued out his writ of ejectment against Colby to recover the seisin and possession of his whole farm, and at the December Term, Orange County Court, 1831, recovered a final judgment for the same, and that this recovery was based upon the fact that Colby had failed to perform his contract with Tracy; that on the 18th day of January, 1830, Colby conveyed by quit-claim deed, to the defendant Sally Hutchins, the whole of his interest in Tracy's farm; that from the time judgment was rendered against Colby in the ejectment suit, he neglected and refused to fulfill his agreement, and to provide any support for Tracy, and entirely abandoned his contract with him; that the said Sally Hutchins has also neglected and refused to afford any support for Tracy or to fulfill the agreement of July 16th, 1820, in any particular; that she had full knowledge of the circumstances under which the conveyance was made to Colby, and when she took said conveyance she knew that Tracy claimed that Colby had forfeited all right to hold said farm by reason of his non-performance of said contract; that in 1836, Tracy died, and in his last will and testament devised to his daughter, Jerusha Tracy, the oratrix, the undivided half of his real estate that had been conveyed by him through Colburn to Colby; that in 1860, Sally Hutchins brought an action of ejectment against the oratrix to recover the seisin and possession of the said undivided half of the Tracy farm. And during the pendency of said action the oratrix brought this bill in chancery, praying that the said Sally Hutchins might be enjoined from further prosecution of her suit of ejectment against

the oratrix, and from asserting any claim to the premises in controversy, and that she should release all claim to the same, and for general relief. The defendant in her answer denied all the material facts alleged in the bill, except the fact of the several conveyances referred to therein, and averred that Colby paid Colburn $200, in consideration of the conveyance to him; that the life lease of 1825, expressed the only agreement in force between Tracy and Colby as to the support of Tracy, and merged all that had theretofore been agreed between the parties; that Colby made many permanent improvements on the farm; that in doing this he got embarrassed by debts, and that she advanced him money to pay his debts and took a deed of his real estate; that she was the sister-in-law of Colby and the daughter of Tracy and the half-sister of the oratrix, and took this deed of Colby and paid up his debts for the benefit of all parties generally; that the ground upon which Tracy recovered the seisin and possession of the farm against Colby, was the fact that he had a freehold estate by the lease of 1825; that since the recovery in that suit, neither she nor Colby had been permitted or allowed to furnish a support to the Tracys. The answer was traversed and testimony was taken, the result of which is sufficiently stated in the opinion of the court. The cause was heard at the January Term, 1863, Orange County, by PECK, Ch., who decreed in substance, that the defendant be perpetually enjoined from prosecuting her suit of ejectment and from bringing any other action for the recovery of the seisin and possession of the premises in question, based on her title and claim under her deed from Colby, and that she release to the oratrix all her right, title and interest in the premises, derived by, through or under said deed,—from which decree the defendant appealed.

*Washburn* and *Marsh*, for the defendant, cited *Olcott* v. *Dunklee*, 16 Vt. 478, upon the point as to what was the interest of Colby in the estate after the execution of the life lease, and what was his legal right. By the conveyance to Mrs. Hutchins, she acquired the rights of Colby, as shown by the record. The eject-

ment of Colby could not affect Mrs. Hutchins's rights, for she
was not made party to the suit.   *Marvin* v. *Denison*, 20 Vt.
664.

For the non-performance on the part of Colby, the freehold
was lost but not the inheritance.   *Abbe* v. *Goodwin*, 7 Conn. 377.
Mrs. Hutchins is entitled to stand upon the record, and is not
affected by any estoppel or equities, as between Tracy and Colby.
*Bigelow* v. *Topliff*, 25 Vt. 288.   But she has equitable as well
legal rights, which she is entitled to have protected.   The deed
and life lease were recorded, and showed the fee in Colby and
only a life estate in Tracy.   Had any further right or interest
been intended, this agreement would also have been incorporated
and spread upon the record.   A court of equity will not lend its
aid to enforce a condition subsequent.   4 Kent 129.

*Peck* and *Colby*, for the oratrix:

The contract between Colby and Tracy is embraced in the
written contract of July 16th.   The only consideration paid
Tracy for the conveyance was the agreement to support the old
people.   The defendant knew, or was bound to know, on what
terms Colby occupied the premises.   She was Tracy's daughter,
lived in the same town and visited home often.   There was a
breach of the contract on the part of Colby prior to the time that
the defendant took her deed, January 18th, 1830.   Mrs. Hutchins
having taken her deed with notice of the terms upon which Colby
occupied the farm, succeeds to all his rights, no less, no more.
She cannot recover then.

BARRETT, J.   The written contract of July 16th, 1820, lies
at the foundation of the respective rights and liabilities of the
parties to this suit.   The deed from Colburn to Colby of July
17th, 1820, and the lease from Colby to Elijah Tracy of the 11th
of March, 1825, were made in pursuance of, and were designed
to effectuate, certain provisions of said agreement.   They do not
constitute the agreement, nor do they control its effect.   They
may, in certain aspects of the case, constitute evidence tending

Tracy *v.* Hutchins.

to aid the construction, and indicate the effect to be given to that written contract, where doubt as to its construction and effect arises upon its face. In the same legal view, pertinent facts, shown by the oral evidence, may be used for the same purpose. It is to be remarked, that that written contract is very inartificially drawn, and is very meagre in the detail of its provisions; and, in order fully to appreciate it, as embodying and evincing the intent of the parties to it, resort must be pretty freely had to facts shown by other proofs in the case.

It appears that Mr. Tracy was aged and infirm; and, owning the farm in question, he was desirous of making an arrangement by which to free himself from the care and labor of carrying it on, and, at the same time, to secure for himself and wife a comfortable living, during their several lives, and a home for their daughter, Jerusha—the oratrix—till she should have a home of her own. For this purpose, in 1819, he entered into an agreement with Colburn, the same, in substance, as that afterwards made with Colby; and in pursuance thereof conveyed to him an undivided half of his farm, and took from him a life lease of the same. Colburn's health failing, he became desirous of giving up the arrangement; and Colby agreed with him to come in in his place; to which Mr. Tracy assented; and, to consummate the substitution, said contract of July 16th, 1820, was made between the parties to it; and Colburn conveyed said half of the farm to Colby; Tracy, at the same time, discharging Colburn from all liabilities under the arrangement that had been made between them in 1819. It appears still further, that Tracy did not receive any consideration in money, or other property, for the conveyance of said one-half of his farm either to Colburn or to Colby—the only consideration of such conveyance being the arrangement, by which he was to have the whole farm carried on, and to have the stipulated support for himself, wife and daughter.

We understand the writing of July 16th, 1820, to be a *single* agreement, made up of several mutual stipulations, all constituting the arrangement designed to be entered into by the parties;

and we think that the provisions of that writing, by their terms, when taken in connection with the subject matter, as developed by the writing itself, and the other evidence in the case, result (as touching the title to be acquired by Colby, by virtue of the deed conveying the one-half of the farm) in this,—that his title, under that deed, was conditional upon his fulfilling the stipulations on his part to carry on the whole farm, and furnish the support and home therein named ; and that upon his neglect or refusal to fulfill said stipulations, Tracy had the right to re-enter upon the whole farm, and hold the same, free and aquit of any right of Colby thereto.

We regard the provision for the life lease, as a mode, supposed by the parties to be proper and adequate, of enabling Mr. Tracy, in case of neglect or refusal on the part of Colby to perform his undertaking, to make that security and to resume his possession in full right of his original title in fee. While we think the parties were clear and concurrent in their intents, it seems quite obvious that they had pretty crude notions, as to the most comprehensive and proper mode of putting them into writing.

It is said by some of the witnesses, that the life lease was designed as a *security* to Mr. Tracy for the support, &c., stipulated by Colby. And this is undoubtedly true ; but the only mode in which it could operate as security, was in virtue of Tracy's right to resume the possession, and hold it against any right or title of Colby under his deed. For it is obvious, that the mere right to resume possession was no security. That would only have enabled Tracy to place himself in the very position, from which he sought and designed to relieve himself, by making the arrangement,—and with this strange result, viz : that he would have been giving away one-half of his farm, without any pecuniary consideration, and without obtaining that relief from the burden of carrying it on and supporting himself and family, which in point of fact, constituted the sole motive and consideration for conveying it. That would have left the parties in such a position, that Colby might, at once, on the execution of the agreement, the deed, and the lease, have said to Mr. Tracy, " I decline to

carry on the farm, or furnish you any support. Enter and hold for life, and support yourself and family as you best may. I shall be abundantly satisfied, on the termination of the lease by the death of the parties for whose lives it is to run, to take the one undivided half of the farm, particularly as I shall have paid you no value for *it*, nor have been put to any other inconvenience or expense, save that of negotiating the arrangement, executing the papers, and receiving the conveyance."

This strongly illustrates what must have been the intent and understanding of the parties, as to the end to be served by the life lease, and renders clear what was meant by the expression in the agreement, viz: " And said Tracy agrees to let said Colby have the farm so long as he fulfils the above agreement ;" not merely, that Tracy would permit Colby to occupy, and would not assert his right of possession under his life lease, so long as Colby should fulfil said agreement ; not that, in case Colby should fail to fulfil, Tracy was then to stand only upon his right of possession under said life lease ; but that it was connected with Tracy's agreement to deed, and was designed to characterize and limit the right which Colby was to have under his deed.

Translated into the common language, in which such parties naturally express the intent which was mutually had by them at the time, the agreement is virtually this—" That Tracy would deed half of his farm to Colby, if Colby would carry on the whole, and support Tracy and his wife during their lives, and give Jerusha a home and support till she has a home of her own ; and would let Colby have it so long as he should do this. But if he should neglect or refuse to do it, then his right in it would be at an end, and Tracy would hold it, the same as if no conveyance or arrangement had been made."

The point made in the answer, that the lease of March, 1825, merged all that had theretofore been agreed between the parties, and became the sole contract between them, is not made in the argument. The argument has proceeded on the ground, that, in order to determine the respective and relative position and rights of Tracy and Colby, the lease was to be taken in connection with the contract of July 16th, 1820. The utter inadequacy of the

16

Tracy *v.* Hutchins.

lease, by itself, to show the true relation of the parties, is obvious ; for it contains no stipulations on the part of Colby, as to the support of the *lessee,* his wife and daughter, nor as to his carrying on any part of the premises.   On its face it would seem to indicate that Tracy had made a gift of one half of his farm to Colby, reserving to himself, by the lease, the right of possession for the life of himself and wife, on condition that he performed the many and stringent stipulations on his part to be performed, in the lease contained.

It is only in the light furnished by the contract of July 16th, 1820, that the lease has any reasonable significance ; and in that light, the intent and purpose to be served by it, when the subject matter is considered in connection, is quite palpable, and that is sufficiently indicated in what we have already said.   The evidence shows that the lease was written by an unskilled hand, and was taken from an old book of English forms.

At this point, and in this connection, it is proper to remark, that hence appears the difference between this case, and that of *Olcott* v. *Dunklee,* 16 Vt. 478 ; and of *Dunklee* v. *Adams, Adm'r,* in Chancery, 20 Vt. 415, on which great reliance is placed by counsel for the defendant as a controlling authority.   In the case in Chancery it appeared that the original deed from Olcott to Dunklee was for the consideration, paid, of $800, and was absolute, and without condition either in law or equity.   In the action of ejectment, the rights of the parties depended entirely on the life lease from Dunklee to Olcott, which was absolute to Olcott, and contained special covenants in detail, showing the whole contract between the parties ; and the question was, whether ejectment could be maintained upon Olcott's title under said lease, for breaches of the covenants on the part of Dunklee, on the performance of which covenants, Dunklee's right to occupy the premises depended.   Olcott put himself solely on his right to a *freehold* estate under the lease, and gave the lease alone in evidence as the ground of his right.   Of course he recovered according to that right, the possession of a *freehold,* and not of an inheritable estate in fee.   But in the case before us, we find the original conveyance to have been *upon condition,* though the

condition was not inserted in the deed, but was contained in, and evidenced by an agreement in writing, constituting the substance of the contract, as a part, and in pursuance of which, said deed was executed,—an agreement binding between the parties to it, and which it would be the duty of a court of Equity to give effect to, according to the intent of the parties, consistently with its terms and provisions.

The evidence shows a breach of the condition, in the neglect of Colby to provide the stipulated support.   The record evidence shows a recovery by Tracy in ejectment against Colby, December Term, 1831, of Orange County Court, upon the plea of not guilty, and by verdict of a jury.   No writ of possession was taken upon that judgment.   It appears, however, that soon after the recovery of said judgment, Colby abandoned the premises, and that never thereafter did he, or the present defendant, or any one in their behalf, do anything towards carrying on the farm, or towards the support of Mr. Tracy, his wife or daughter, though Mr. Tracy lived till 1835, and Mrs. Tracy till 1859, and the daughter is still living.

It is quite clear then, that in favor of Colby, no right could be asserted, either at law or in equity, as against Mr. Tracy and those holding under him.   The breach of the condition on which he held the title, the recovery in ejectment against him, his abandonment of the possession, and his continued neglect to do, or to offer anything that was incumbent on him to do, in order to maintain any continued right in the property, would conclusively exclude him from asserting any existing right in the property.

It now remains to consider the relation that Mrs Hutchins sustains to the property, under the deed from Colby to her, January 18th, 1830.   At that time the Record showed title by deed in Colby of an undivided half of the Tracy farm, subject to a lease of the same to Tracy, his heirs and assigns, for the several life of himself and his wife.   As against Mr Tracy, and those claiming under him by rights subsequently acquired, Mrs Hutchins might stand safely on the title evidenced by the Record, in taking said conveyance from Colby, unless, in point of fact, she is chargeable with notice and knowledge of the real

character, true intent and meaning of the arrangement between Tracy and Colby, in pursuance of, and to effectuate which, said deed to Colby, and lease to Tracy were executed. On this point of fact we have no occasion to present an analysis, or enter into a discussion of the evidence. It is sufficient to say that the evidence produces entire unanimity in the several members of court who have heard the case, in the conviction that she was cognizant, at the time she took said deed, of the character and intent, in substance, of the arrangement and contract under, and in pusuance of which, said deed to Colby and lease to Tracy were executed. This being so, she must be regarded in a court of Equity as equally, and in the same way affected, in respect to her rights, as Colby would be, if he were attempting to set up and enforce rights under and by virtue of the deed conveying to him the one half of said premises. In attaining this result, we have no occasion to give any effect, as against Mrs. Hutchins, to the judgment in said action of ejectment against Colby. We only regard the well-established fact that Colby had committed breaches of the condition upon which his title to the property, under his deed, depended; and which she permitted to be repeated and continued from the time she took her deed, during the life of Mr Tracy and his wife,—a period of some nineteen years, without making any effort, by act, or offer, to save herself from the consequences of such breaches.

It is needless to say what would have been the effect upon her rights, if, on taking her deed, she had taken steps to make amends for the breaches that had then occurred, and had taken, or offered to take, on herself the burden thereafter of fulfilling the undertakings of Colby, to carry on the farm and provide the stipulated support. Having failed to do anything of the kind, and having permitted the possession of the farm to be resumed by Mr. Tracy, and ever since to be held in pursuance of his right in that behalf, and left him and his wife and daughter to carry on the same, and to provide themselves with support without aid, she is not entitled to set up and now maintain any right as against said Tracy and those deriving from him title to said property.

Indeed we regard the course taken by all the parties as a

mutual abandonment of the arrangement originally entered into ; and that, since Colby left the premises, soon after said judgment in ejectment, the property has been vested in Mr. Tracy and his assigns, in virtue of his original title in fee.

The course taken by Colby upon the decease of Mr. Tracy, in presenting and prosecuting his claims for various things rendered · by way of former support from 1820 to the time he abandoned the farm, and particularly for *betterments*, spoken of and provided for in the original contract between him and Mr. Tracy, shows quite plainly how he regarded the matter, and that, as between himself and Mr. Tracy, his wife and daughter, the whole thing was ended.

As the views thus presented seem ample in warranting the result we arrive at, in affirming the decree of the Chancellor, we have deemed it needless to comment on several incidental views, which bear upon, and make plain the inequity of permitting the defendants as against the oratrix, to set up and enforce the right she claims, under her deed, in the action of ejectment.

The case is remanded to the Court of Chancery, with directions to modify the decree as to the times in which the several things are ordered to be done by the defendant, so as to give the same times respectively from the next term of said Court of Chancery. With such modification, said decree is affirmed with costs to the oratrix in this court.